# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>ex rel. Juan Pablo Alperin<br><br>Plaintiff-Relator,<br><br>v.<br><br>Elsevier B.V., Springer-Nature AG & Co. KGaA., Informa Group Limited, & John Wiley & Sons Inc.<br><br>Defendants | Civil Action No.  24-cv-10603-ADB<br><br><br>FILED UNDER SEAL<br>PURSUANT TO 31 U.S.C. § 3730(b)(2)<br><br><br>JURY TRIAL DEMANDED |

## AMENDED FALSE CLAIMS ACT COMPLAINT

### TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................3

II.   PARTIES, VENUE & JURISDICTION......................................................................4

III.  LEGAL FRAMEWORK..............................................................................................6

  A.  Cost Requirements of Federal Grants........................................................................7
  B.  Public Health Grants ................................................................................................13

IV.   FACTS AND ALLEGATIONS................................................................................14

  A.  Samples of Defendants' Fraudulent Claims for Property and Payment...........14
  B.  Rising Concern by U.S. Grantmaking Agencies As Defendants' APCs Have
      Drained Science Budgets .......................................................................................17
  C.  How Defendants' Scheme Results in Presentment of Claims for Payment
      and Property ............................................................................................................34

      1.  Defendants' Presentment of Claims for Payment and Property to
          U.S. PIs and U.S. Grantees.................................................................................37
      2.  US Grantees' Presentment of Claims for APC Reimbursement to
          U.S. Grantmaking Agencies. .............................................................................39

  D.  Defendants' APCs Are Unreasonable and Hence Unallowable Charges to
      Federal Grants. ........................................................................................................40

      1.  Defendants' APCs Are Ten Times Their True Processing and Public
          Access Delivery Costs ........................................................................................40
      2.  Defendants' Academic Editors With Similar Sense of Prudence as
          U.S. PIs Find Defendants' APCs Unreasonable. ............................................45
      3.  Defendants Charge U.S. Grantmaking Agencies More Than They
          Often Charge Nongovernment Payors, Violating 2 C.F.R. 200.461.............47

  E.  Hybrid APCs Are Unnecessary and Hence Unallowable Charges to Federal
      Grants .......................................................................................................................50
  F.  Defendants's Strategies To Hide True Article Processing and Public Access
      Delivery Costs And Otherwise Induce Continued Payment ..............................53

CAUSES OF ACTION ..................................................................................................60

PRAYER FOR RELIEF .................................................................................................67

## I.    INTRODUCTION

1.    This case arises out of a decade-long nationwide scheme to cause U.S. research institutions receiving federal grants (hereafter, "US grantees") to claim reimbursement from U.S. agencies that award grants for scientific research (hereafter, "US grantmaking agencies"), for unreasonable and unnecessary "article processing charges" ("APCs"). The Defendants are the four largest academic publishers, and the Relator, Dr. Juan Alperin, is a scholar of their industry who has identified specific false claims and who has unique inside information and insights into Defendants' fraudulent business practices.

2.    The U.S. grantmaking agencies that have fallen victim to Defendants' scheme include but are not limited to: the Department of Health and Human Services ("HHS," including within it the National Institutes of Health or "NIH"), the Department of Energy ("DOE"), the Department of War ("DOW," formerly Department of Defense or "DOD"), the National Aeronautics and Space Administration ("NASA"), and the National Science Foundation ("NSF").

3.    Defendants' schemes flourished after the U.S. grantmaking agencies introduced public access policies to require the Principal Investigators (hereafter, "US PIs") of awarded grants to make grant products – the academic articles that report on the results of the funded research -- publicly accessible at no charge to the American taxpayer. Public access is seemingly a public good that enables any reader, whether peer researchers, the parent of a sick child, a teacher preparing for a class, or the

consumer of a new product, to access the research that their tax dollars have produced, without paying an academic publisher a second time to do so.

4.    But Defendants, who had traditionally made money by contracting academic authors for exclusive copyright and then selling content subscriptions to readers and librarians, responded to public access mandates by extorting APC and copyright transfers from unknowing U.S. PIs with an understandable desire to publish in prestigious venues to advance in their careers.

5.    Defendants first agreed on restrictive copyright terms for their most prestigious, hybrid journals, and then increased APCs to the order of ten times their true costs for processing articles and delivering public access.[1] Their APCs rose in tandem year after year to between $2,000 and $4,000 to cover the $200-$400 cost of making a federal grant product accessible online; and at the higher end more than $10,000 for a prestige publication that would cost them in the order of $1,000 to process.

6.    While an academic publication in a prestige venue appears to have a certain legitimacy that other personal luxuries do not, the scale of Defendants' exploitative copyright arrangements and APC mark-ups is no different than if they induced uninformed U.S. grantees to charge federal grants to send U.S. PIs to

---

[1] Throughout this Complaint, "APC" or "price" refers to the amount Defendants charge, and grantees pay and bill to federal grants — which is a "cost" to a grantee within the meaning of 2 C.F.R. Part 200 and its Cost Principles. "True Cost of Processing and Public Access Delivery" refers to the separate and much smaller expense Defendants actually incur to process an article and make it accessible online.

2

conferences in private jets or to deliver five-star Michelin meals to where PIs' research assistants or postdoctoral researchers were working towards grant objectives at the laboratory bench, while assuring the government and its funding recipients that this is simply the price of travel and catering nowadays.

7. Indeed, as detailed *infra*, Defendants' conduct has caused a decade's worth of knowing violations of reasonableness, necessity and documentation requirements in the Office of Management and Budget ("OMB")'s Cost Principles at 2 C.F.R. Part 200 Subpart E[2] and hence violations of the False Claims Act at 31 U.S.C. §§ 3729. And in an independent collusive scheme also alleged *infra*, the alignment of Defendants's restrictive copyright terms and increasing APCs obstructs the market entry of affordable public access compliance options, including the U.S. grantmaking agencies' own public access repositories, producing rigged and therefore fraudulent claims for payment and property to U.S. PIs.

8. While Defendants historically contributed to the dissemination of knowledge, a decade of exploitative business practices in response to public access

---

[2] For clarity, this 2024-filed action filed *qui tam* alleges a fraud scheme that Defendants perpetrated for a decade prior to the May 29, 2026 Office of Management and Budget ("OMB") proposal to make sweeping changes to 2 C.F.R. Part 200 that would presumptively but not retroactively disallow APC charges on grants. *See* https://www.regulations.gov/document/OMB-2026-0034-0001 at 2 C.F.R. § 200.461. While OMB's proposed revisions to 2 C.F.R. Part 200 Subpart E have drawn controversy, Relator pleads *infra* that OMB's current proposal to restrict publication costs at 2 C.F.R. § 200.461 is consistent with a decade of concern by academics and U.S. grantmaking agencies about the aggregate burden of Defendants' APCs and their restrictive copyright agreements on the US; and also with decisions by philanthropic funders to stop paying APCs.

policies have created a monster that is draining science budgets for no necessary or reasonable government purpose. Given full information about Defendants' true cost of processing articles and delivering public access, it is hardly credible that any prudent U.S. PI, academic librarian, or grantmaking agency program officer would charge the public fisc to pay Defendants thousands of dollars to place a PDF of an article online; and Defendants know it.

## II.    PARTIES, VENUE & JURISDICTION

9.    Juan Pablo Alperin, the Relator in this action, is a resident of Vancouver in British Columbia, Canada.

10.    Relator is a tenured Associate Professor at Simon Fraser University and the co-director of the Scholarly Communications Lab (aka "ScholCommLab"), based in Ottawa and Vancouver, Canada.

11.    Relator Alperin has not only published peer-reviewed scholarship regarding Defendants' business practices: he has co-originated datasets of APCs, has drawn on his and his close colleagues' expertise to curate and analyze such datasets, has attended workshops, conferences and other events attended by Defendants' employees, and has engaged in confidential email correspondence with Defendants' employees involved in the practices alleged in this action; all of which information he provided the government prior to filing this action.

12.    The United States is the real party in interest in this action pursuant to 31 U.S.C. § 3730.

13. Defendant Elsevier, B.V. ("Elsevier") is a Dutch corporation based in Amsterdam in the Kingdom of the Netherlands. It conducts business in the United States through its corporate office at 230 Park Avenue, Suite 800, New York, NY 10169.

14. Defendant Springer-Nature AG & Co. KGaA ("Springer-Nature") is a German corporation based in Berlin, Germany. It conducts business in the United States in part through its subsidiary, Springer Nature America, Inc., and its corporate office at One New York Plaza, Suite 4600, New York, NY 10004.

15. Defendant Informa Group Limited ("Informa") is a British corporation headquartered at 5 Howick Place, London, SW1P 1WG. It conducts business in the United States in part through its corporate office at 605 Third Avenue, New York, NY 10158.

16. Defendant John Wiley & Sons, Inc. ("Wiley") is a New York corporation headquartered at 111 River Street, Hoboken, NJ 07030.

17. This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1345 because Relator brings this action on behalf of the United States as Plaintiff pursuant to 31 U.S.C. § 3730.

18. Venue lies in this Court under 28 U.S. Code § 1391 because Defendants transact business in Massachusetts, including marketing their article processing and public access services to grantee research institutions in Massachusetts, collecting APCs from grantee research institutions in Massachusetts, and causing government grantee research institutions in Massachusetts to submit false claims for payment to U.S. grantmaking agencies, including specific false claims identified *infra*.

5

19.    As detailed below, U.S. grantees located in this district that Defendants knowingly caused to bill unreasonable and unnecessary payments to federal agencies include: Harvard University, Brigham and Women's Hospital, Northeastern University, the University of Massachusetts, and Tufts University.

### III.    LEGAL FRAMEWORK

20.    The FCA imposes civil penalties and liability of up to three times the amount of the harm suffered by the government, on defendants who make or cause a false or fraudulent claim for payment or property to a U.S. government agency. 31 U.S.C. 3729(a)(1)(A).

21.    The FCA imposes civil penalties and liability of up to three times the amount of the harm suffered by the government, on defendants who make a material false record or statement to get a false claim for payment or property paid by a U.S. government agency. 31 U.S.C. 3729(a)(1)(B).

22.    The FCA imposes civil penalties and liability for failure to deliver all property due to the government. 31 U.S.C. § 3729(a)(1)(D).

23.    The FCA imposes civil penalties and liability for knowingly concealing or improperly avoiding or decreasing an obligation to pay or transmit money or property. 31 U.S.C. § 3729(a)(1)(G).

24.    Conspiracy to commit a violation of the FCA is an independent FCA violation. 31 U.S.C. § 3729(a)(1)(C).

25.    To violate the FCA, a false or fraudulent claim for payment need not be presented directly to a government agency; but may be presented to a third party that

is responsible for disbursing government funding (such as the grantee institutions located in this district) in order to fulfill a government objective. 31 U.S.C. § 3729(b)(2).

**A. Cost Requirements of Federal Grants**

26. In December 2013, the Office of Management and Budget ("OMB") issued 2 C.F.R. Part 200 , consolidating eight prior OMB circulars into a uniform set of terms and conditions of payment under U.S. grants.

27. At 2 C.F.R. Part 200 Subpart E, OMB set forth "Cost Principles," to prevent imprudent expenditure, fraud and abuse with federal funding.

28. OMB defined certain costs to grants as unallowable. *See* 2 C.F.R. § 200.403.

29. In the present version of 2 C.F.R. Part 200 Subpart E, costs must meet the following criteria to be allowable charges to federal grants:

> (a) Be necessary and reasonable for the performance of the Federal award and be allocable thereto under these principles.
> (b) Conform to any limitations or exclusions set forth in these principles or in the Federal award as to types or amount of cost items.
> (c) Be consistent with policies and procedures that apply uniformly to both federally financed and other activities of the recipient or subrecipient.
> (d) Be accorded consistent treatment. For example, a cost must not be assigned to a Federal award as a direct cost if any other cost incurred for the same purpose in like circumstances has been allocated to the Federal award as an indirect cost.
> (e) Be determined in accordance with generally accepted accounting principles (GAAP), except, for State and local governments and Indian Tribes only, as otherwise provided for in this part.
> (f) Not be included as a cost or used to meet cost sharing requirements of any other federally-financed program in either the current or a prior period. See § 200.306(b).
> (g) Be adequately documented. See §§ 200.300 through 200.309.

(h) Administrative closeout costs may be incurred until the due date of the final report(s). If incurred, these costs must be liquidated prior to the due date of the final report(s) and charged to the final budget period of the award unless otherwise specified by the Federal agency. All other costs must be incurred during the approved budget period. At its discretion, the Federal agency is authorized to waive prior written approvals to carry forward unobligated balances to subsequent budget periods. See § 200.308(g)(3).

2 C.F.R. § 200.403.

30.    Under 2 C.F.R. 200.201(b)(4), "at the end of a fixed amount award, the recipient or subrecipient must certify in writing to the Federal agency ... that all expenditures were incurred in accordance with § 200.403."

31.    "Necessary" under § 200.403 is not defined at 2 C.F.R. § 200.1, but given other definitions, is conducive to the natural interpretation that a cost charged to a grant could not be avoided in meeting a grant objective. *See* 2 § C.F.R. 200.1 (defining a "cost objective" as a "major function of the recipient or subrecipient, a particular service or project, a Federal award, or an indirect cost activity, as described in subpart E")

32.    The following factors determine whether a cost is "reasonable": "if it does not exceed that which would be incurred by a prudent person under the circumstances prevailing when the decision was made to incur the cost." *Id.* at § 200.404.

33.    Grantmaking agencies question a cost if it "(i) Is noncompliant or suspected noncompliant with Federal statutes, regulations, or the terms and conditions of the Federal award; (ii) At the time of the audit, lacked adequate

8

documentation to support compliance; or (iii) Appeared unreasonable and did not reflect the actions a prudent person would take in the circumstances." 2 C.F.R. § 200.1.

34. With minor changes to language, 2 C.F.R. Part 200 has otherwise maintained the same factors for reasonableness since its enaction.

35. In the present version of 2 C.F.R. Part 200, the following considerations determine whether a cost is reasonable:

> (a) Whether the cost is of a type generally recognized as ordinary and necessary for
> the recipient or subrecipient's operation or the proper and efficient performance of the Federal award;
> (b) The restraints or requirements imposed by such factors as: sound business practices; arm's-length bargaining; Federal, state, local, tribal, and other laws and regulations; and terms and conditions of the Federal award;
> (c) Market prices for comparable goods or services for the geographic area;
> (d) Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the recipient or subrecipient, its employees, its students or membership (if applicable), the public at large, and the Federal Government;
> (e) Whether the cost represents a deviation from the recipient's or subrecipient's established written policies and procedures for incurring costs.

*Id.* at § 200.404.

36. Under 2 C.F.R. § 200.461(b), U.S. grantees may bill "page charges, article processing charges (APCs), or similar fees such as open access fees for professional journal publications and other peer-reviewed publications resulting from a Federal award" to grants, if "(1) the publications report work supported by the Federal Government; and (2) the charges are levied impartially on all items published by the journal, whether or not under a Federal award."

37.    But under 2 C.F.R. §200.421, U.S. grantees and PIs may not charge grants for their own "advertising or public relations" costs.

38.    An authorized institutional representative of a grantee organization must sign the following certification on payment vouchers, or on the annual and final fiscal reports that justify grant expenditures to the grantmaking agency:

> "By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and objectives set forth in the terms and conditions of the Federal award. I am aware that any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me to criminal, civil or administrative penalties for fraud, false statements, false claims or otherwise. (U.S. Code Title 18, Section 1001 and Title 31, Sections 3729–3730 and 3801–3812)."

2 C.F.R. § 200.415(a).

39.    Furthermore, if a cost billed to a grant is not allowable under cost principles, such that the requisite certification cannot be made or turns out to be untrue, then U.S. grantees must return payment for the improper charge to the grantmaking agency. 2 C.F.R. § 200.410.

40.    Post close-out, U.S. grantees have continuing responsibilities to return unallowable costs to a grantmaking agency. 2 C.F.R. § 200.345(a)(2).

41.    Disclosures to a grantmaking agency and its Office of Inspector General are mandatory for U.S. grantees who learn of "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. 3729-3733)." 2 C.F.R. § 200.113.

10

42.     Any charges to a grant that are in excess of the allowable amount 2 C.F.R. § 200.410 constitute a debt to the federal government. 2 C.F.R. § 200.346.

43.     After 2014, U.S. grantmaking agencies' funding opportunity announcements, Notices of Award, and grant paperwork relating to costs, generally incorporated the Cost Principles of 2 C.F.R. Part 200, Subpart E, as conditions of payment, including the certification requirement. U.S. grantmaking agencies also introduced analogous requirements. For example HHS implemented 45 C.F.R. Part 75, later reserving it in favor of 2 C.F.R. Part 200, 2 C.F.R. Part 300 and 2 C.F.R. Part 375, the DOE adopted it with additions at 2 C.F.R. Part 910, the DOW adopted it at 2 C.F.R. Part 1103, later substituting with 2 C.F.R. Part 1104, NASA adopted it with additions at 2 C.F.R. Part 1800, and NSF adopted it with a slight modification at 2 C.F.R. Part 2500.

44.     The Cost Principles at of 2 C.F.R. Part 200, Subpart E classify some costs as "direct costs." 2 C.F.R. §§ 200.412-413.

45.     "Direct costs" are line items in a grant budget that include researchers' salary for the time they allocate to a funded project, materials, equipment and supplies they use: essentially any line item expenditure that is associated with a specific grant or "cost objective." 2 C.F.R. §§ 200.412-413.

46.     In addition to direct costs, U.S. grantees may seek payment from U.S. grantmaking agencies for "indirect costs," or "Facilities and Administration" or "F&A," to cover the costs of providing infrastructure to support the funded research activity. 2 C.F.R. §§ 200.411, 200.414.

11

47.    US grantees are authorized to allocate F&A costs to each grant pursuant to a cost allocation plan approved by either HHS or the Office of Naval Research at DOW. 2 C.F.R. § 200.414(e); Appendix III.C.11.

48.    A grantee institutions' F&A rate is a standard percentage markup of its direct costs, and is intended to reimburse the institution for overhead and not grant-specific costs— including the cost of operating the university library, which counts as a facility. 2 C.F.R. § 200.414(a); Appendix III.B.8.

49.    2 C.F.R. § 200.412 provides that: "There is no universal rule for classifying certain costs as direct or indirect costs. A cost may be direct for some specific service or function but indirect for the Federal award or other final cost objective. Therefore, each cost incurred for the same purpose in like circumstances must be treated consistently either as a direct or an indirect cost to avoid possible double-charging of Federal awards. Guidelines for determining direct and indirect costs charged to Federal awards are provided in this subpart," referring to 2 C.F.R. Part 200 Subpart E, titled "Cost Principles."

50.    The criteria for allowability at 2 C.F.R. § 200.403(d) and (g) that costs must be consistently charged and adequately documented, further underscore that grantees may not use the indirect cost mark-up to double-charge the government for like costs.

51.    Finally, 2 C.F.R. Part 200 also addresses ownership of copyright created using federal awards.

52.    At 2 C.F.R. § 200.315, a grantee "may copyright any work that is subject to copyright and was developed, or for which ownership was acquired, under a Federal

award. The Federal agency reserves a royalty-free, nonexclusive, and irrevocable right to reproduce, publish, or otherwise use the work for Federal purposes and to authorize others to do so. This includes the right to require recipients and subrecipients to make such works available through agency-designated public access repositories."

### B. Public Health Grants

53.    HHS historically had its own set of regulations governing grant administration and cost principles, 45 C.F.R. Part 75. In 2014, HHS began the process of adopting OMB's uniform guidance by aligning 45 C.F.R. Part 75 with 2 C.F.R. Part 200.

54.    From 2014 to 2025, 45 C.F.R. Part 75 incorporated the same definitions of cost reasonableness as that contained in 2 C.F.R. Part 200 and grantees certified compliance with 45 C.F.R. Part 75 in grant applications and progress reports. *See* 45 C.F.R. § 75.404 (effective 2014 to 2025) (defining "reasonable costs" the same as 2 C.F.R. § 200.404).

55.    In October 2025, HHS phased out 45 C.F.R. Part 75 and transitioned to OMB's uniform guidance at 2 C.F.R. Part 200. *See also* 2 C.F.R. Part 300.

56.    Beginning in 2025, the NIH Grants Policy Statement and all notices of award mandated compliance with 2 C.F.R. Part 200, and all grantees certified compliance with 2 C.F.R. Part 200 in grant applications and progress reports.

13

57. Thus, unreasonable or unnecessary article processing charges, outlined in more detail below, violate the cost principles in both the 2 C.F.R. Part 200 uniform guidance and the prior regulations at 45 C.F.R. Part 75.

## IV. FACTS AND ALLEGATIONS

### A. Samples of Defendants' Fraudulent Claims for Property and Payment

58. As detailed *infra*, U.S. government officials have struggled to quantify, audit, or assess the reasonableness of Defendants' APCs due to the decentralized nature of APC payment claims across many U.S. PIs, grants, program managers and U.S. grantmaking agencies, as well as a lack of transparency into Defendants' actual processing costs.

59. Relator however, has begun to confirm subsets of fraudulent claims through a combination of his independent investigation and cross-analysis of largescale datasets.

60. As an example of a sample of fraudulent claims for payment, Defendants received APC payments and copyright transfers at the expense of the below grantmaking agencies as a result of claims to unknowing PIs at the listed grantee institutions:

| Defendant | APC at Time of Publication | Date of Publication | Grant | Grantee Institution |
|---|---|---|---|---|
| Elsevier | $3,000 | November 29, 2021[3] | NSF 1849588 or SRC SB-2837-B (contract with NSF) | Northeastern University in Boston, Massachusetts |
| Elsevier | $1,980 | January 26, 2021[4] | NSF 1718177 | Northeastern University in Boston, Massachusetts |
| Springer Nature | $4,400[5] | January 25, 2021[6] | NIH DP1OD022296 or P41EB015903 | Harvard University in Cambridge, Massachusetts |
| Wiley | $5,000 | May 3, 2021[7] | NSF 2004875 | Northeastern University in Boston, Massachusetts |
| Wiley | $2,700 | May 1, 2021[8] | NIH R13AR073334 | Brigham and Women's Hospital in Boston, Massachusetts |

---

[3] Chen T, Ali Al-Radhawi M, Voigt CA, Sontag ED. A synthetic distributed genetic multi-bit counter. iScience. 2021;24(12):103526.

[4] Amit Sangwan, Josep M. Jornet. Beamforming optical antenna arrays for nano-bio sensing and actuation applications. Nano Communication Networks. 2021; 29:100363.

[5] Relators estimated this figure based on pricing information from 2017 and the present day.

[6] Tang SJ, Dannenberg PH, LiaUS PIs AC, Martino N, Zhuo Y, Xiao YF, Yun SH. Laser particles with omnidirectional emission for cell tracking. Light Sci Appl. 2021;10(1):23.

[7] Birnbaum DP, Manjula-Basavanna A, Kan A, Tardy BL, Joshi NS. Hybrid Living Capsules Autonomously Produced by Engineered Bacteria. Adv Sci (Weinh). 2021 May 3;8(11):2004699.

[8] Solomon DH, Weissman JS, Choi H, Atlas SJ, Berardinelli C, Dedier J, Fischer MA, Fitzgerald J, Hinteregger E, Johnsen B, Marini DD, McLean R, Murray F, Neogi T, Oertel LB, Pillinger MH, Riggs KR, Saag K, Suh D, Watkins J, Barry MJ. Designing a Strategy Trial for the Management of Gout: The Use of a Modified Delphi Panel. ACR Open Rheumatol. 2021 May;3(5):341-348.

| Informa | $2,575 | February 4, 2021[9] | NIH R34-AR-076077 | Tufts University |
| --- | --- | --- | --- | --- |

61. As one example of a PI outside Massachusetts who unknowingly charged an unreasonable APC to one of the NIH grants he holds, PI Tony Wilson at Boys Town National Research Hospital in Nebraska, charged the NIH for an APC of approximately $3,300 to publish a research article in Elsevier's journal NeuroImage.[10]

62. Relator identified the APCs charged to federal grants by finding articles that acknowledge U.S. federal funding in journals that charge APCs, and confirmed grantees charged them to the listed grantmaking agencies by personal follow-up with the PI.

63. By personal follow-up with PIs, Relator also identified five instances in which PIs holding grants for which the grantee would charge a mark-up for indirect costs, referenced having access to institutional sources of funding to cover one of Defendants' APCs.

64. As further detailed below, Defendants' true costs of processing and public access delivery for the above grant products were approximately one tenth of the listed APC prices, making them unreasonable and hence unallowable.

---

[9] Chung M, Zhao N, Meier R, Koestler DC, Wu G, de Castillo E, Paster BJ, Charpentier K, Izard J, Kelsey KT, Michaud DS. Comparisons of oral, intestinal, and pancreatic bacterial microbiomes in patients with pancreatic cancer and other gastrointestinal diseases. J Oral Microbiol. 2021 Feb 14;13(1):1887680.
[10] Springer SD, Erker TD, Schantell M, Johnson HJ, Willett MP, Okelberry HJ, Rempe MP, Wilson TW. Disturbances in primary visual processing as a function of healthy aging. Neuroimage. 2023;271:120020.

65. Relator has collaborated with academic colleagues to create a dataset that gathers Defendants' list prices and cross-correlates it with publicly available articles that acknowledge grantmaking agency awards.

66. Defendants' websites and a sample of Defendants' copyright transfer agreements gathered by Relator from academic authors, show alignment on terms that would require all U.S. PIs that do not pay APCs to transfer Defendants exclusive worldwide copyright, with a narrow exception allowing them to deposit in grantmaking agency public access repositories only the unformatted accepted versions (the so-called Author Accepted Manuscript or "AAMs"), and not the final versions.

67. By cross-comparison of Relator's dataset of list prices with OpenAPC — a dataset of self-reported prices paid for APCs — Relator has identified APCs paid on behalf of grantees by nongovernment funders that are below the list price presented to U.S. PIs and available to grantmaking agencies in the absence of discounts.

68. While manual confirmation of each APC paid for by U.S. grantmaking agencies is arduous due to the many U.S. grantees and PIs involved, Relator's expert projection is that discovery in this action would almost surely result in the identification of a large, robust set of fraudulent copyright and payment claims that could be credibly extrapolated to damages on a scale of a billion dollars.

## B. Rising Concern by U.S. Grantmaking Agencies As Defendants' APCs Have Drained Science Budgets

69. In 2008, NIH introduced a mandatory Public Access Policy. *See* NIH Notice NOT-OD-08-033, https://grants.nih.gov/grants/guide/notice-files/not-od-08-033.html (requiring U.S. PIs to deliver "Public Access to Archived Publications

17

Resulting from NIH-Funded Research," making previously voluntary guidance mandatory).

70. NIH required U.S. PIs to make articles "publicly available no later than 12 months after the official date of publication." *Id.*

71. NIH specifically required articles be available in the National Laboratory of Medicine's PubMed Central services.

72. NIH allowed "publication costs, which include fees charged by a publisher, such as color and page charges, or fees for digital distribution" as charges to its research grants. NIH Notice NOT-OD-05-022, https://grants.nih.gov/grants/guide/notice-files/NOT-OD-05-022.html.

73. But NIH established three conditions for charging publication costs to grants and contracts: "(1) such costs incurred are actual, allowable, and reasonable to advance the objectives of the award; (2) costs are charged consistently regardless of the source of support; (3) all other applicable rules on allowability of costs are met." NIH Notice NOT-OD-25-047, https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-047.html (2024 NIH Public Access Policy, citing 2008 FAQs).

74. On February 22, 2013, John Holdren, Office of Science and Technology Policy ("OSTP") director during the Obama administration, released a memo titled "Increasing Access to the Results of Federally Funded Scientific Research," https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/ostp_public_access_memo_2013.pdf ("Holdren Memo").

75. The Holdren Memo "allow[ed] the inclusion of appropriate costs for data management and access in proposals for Federal funding for scientific research." *Id.* at p. 5.

76. The Holdren Memo aimed to maximize public access to scientific data "while preserving the balance between the relative value of long-term preservation and access and the associated cost and administrative burden." *Id.* at p. 5.

77. The Holdren Memo provided that grantmaking agencies should create plans to ensure that the public can access "peer-reviewed manuscripts or final published documents within a timeframe that is appropriate," proposing a 12-month embargo or grace period by which U.S. PIs would have to show compliance. *Id.* at p. 3.

78. Holdren also called for grantmaking agencies to establish an archival solution to store articles and their metadata, but allowed that this could be either a commercial publisher solution or an agency public access repository.

79. In December 2013, OMB introduced 2 C.F.R. 200 Subpart E, which addressed publication costs as allowable charges, but neither provided nor implied that public access was a luxury service to benefit U.S. PIs, U.S. grantees or publishers or that it could under any circumstances be exempt from OMB's definitions of allowable or reasonable cost within the new regulation.

80. In response to OMB and the Holdren Memo, U.S. grantmaking agencies joined NIH in requiring U.S. PIs deliver public access to grant products within 12 months of the publication date, while also requiring that the resulting publication costs be reasonable.

81.    DOD's Undersecretary of Defense responded to the Holdren Memo by notifying all DOD departments that publicly releasable DOD-funded articles should be available in DTIC, its public access repository. *See* Public Access to the Results of Department of Defense-funded Research, https://web.archive.org/web/20141014005601/https://dtic.mil/dtic/pdf/PublicAccessMemo2014.pdf.

82.    NASA required that publication costs must "be diligently managed and minimized." NASA 2014 Public Access Plan at p. 13, https://ntrs.nasa.gov/api/citations/20150020926/downloads/20150020926.pdf. NASA further wrote that: "Since implementation risk translates into increased costs, a corollary is that risk also must be held to a minimum." *Id.*

83.    NASA aimed generally to balance "the relative value of long-term preservation and access and the associated costs and administrative burden," showing that the agency warned against excessive publication costs but lacked sufficient information to provide specific guidance. *Id.* at p. 10.

84.    Similarly, DOW (at that time DOD) intended its policy to "determine the balance between relative value of long-term preservation and access and associated cost and administrative burden." *See* DOD 2015 Public Access Plan at p. 11, https://discover.dtic.mil/wp-content/uploads/2018/06/dod_public_access_plan_feb2015.pdf.

85.    DOD warned that funds for costs to make research publicly accessible "will be drawn from the existing DOD budget since no additional funds will be provided to accommodate the associated costs." *Id.* at p. 3.

86.    NSF required investigators to share publications and the underlying supporting materials "at no more than incremental cost and within a reasonable time." NSF 2015 Public Access Plan at p. 7, https://nsf-gov-resources.nsf.gov/pubs/2015/nsf15052/nsf15052.pdf.

87.    Despite the U.S. grantmaking agencies' warnings that the cost of public access services should not be unreasonable, Defendants' responded to the public access policies with aligned business practices that gouged the public fisc for unreasonable and unnecessary APCs.

88.    Defendants converted traditional prestige journals that were career-making publication venues for U.S. PIs into "hybrid" journals in which U.S. PIs could choose to pay a higher APC than if publishing in a fully open access journal, an option often called "gold," or could select a free option called "green" that would maintain their article behind a paywall for the embargo period envisioned by Holdren.[11]

89.    Defendants began to present U.S. PIs with copyright transfer agreements that permitted deposit in grantmaking agencies' open access repositories only for the

---

[11] Publishers adapted a nomenclature of "gold" versus "green" for APCs, from the so-called Budapest Open Access Initiative, which distinguished between the "self-archiving" or green route to open access and the "open access journal" or gold route to open access. *See* https://www.budapestopenaccessinitiative.org/boai10/.

version of U.S. PIs manuscripts that Defendants had agreed to publish, the AAM, never Defendants' final typeset version.

90. Defendants also proliferated families of "gold" or "open access" journals that presented unknowing U.S. PIs with APC invoices ten times the costs Defendants' incurred to deliver public access on Defendants' websites.

91. Relator derived the estimates in the table below from a dataset compiled by his colleague, Eric Schares, in support of Schares' academic article, "Impact of the 2022 OSTP memo: A bibliometric analysis of U.S. federally funded publications, 2017–2021," *Quantitative Science Studies*, 4(1), 1–21 (2023).

92. Schares' dataset identifies federally funded articles by their acknowledgment sections, which typically credit the agency that funded the underlying research.

93. Relator exercised his unique expertise to combine Schares' articles with APC prices drawn from the self-reported paid APCs found in the OpenAPC database to estimate Defendants's APC revenues from U.S. grantmaking agencies between 2017 and 2021, broken down by Defendants' "gold" and "hybrid" nomenclature.

| Publisher | Federally funded publications (2017-2021) | | | | |
| | Gold Open Access | | Hybrid Open Access | | |
| | Number of gold publications | Estimated gold APCs | Number of hybrid publications | Estimated APCs | Estimated unnecessary APCs |
| Springer-Nature | 63,804 | $ 146,132,918 | 10,357 | $ 31,944,282 | $ 31,944,282 |
| Elsevier | 27,312 | $ 62,490,476 | 21,016 | $ 68,458,102 | $ 68,458,102 |
| Wiley | 12,841 | $ 26,156,273 | 8,258 | $ 24,308,492 | $ 24,308,492 |
| Taylor & Francis | 4,098 | $ 7,057,495 | 2,041 | $ 3,505,842 | $ 3,505,842 |
| Total | 108,055 | $ 246,255,062 | 42,430 | $ 129,106,996 | $ 129,106,996 |

22

94. To improve the reliability of these estimates, Relator and his research team compiled an independent dataset of Defendants' historical list prices dating to 2019 for Elsevier, Springer-Nature, and Wiley.

95. Historical price lists were not retrievable for Informa; for that Defendant, Relator relied on OpenAPC as in the estimate above.

96. The below table is Relator's updated estimate to the above chart for the period from 2019 until 2025 for Defendants, using Relator's own dataset of list prices, which Relator considers more complete than the OpenAPC dataset, cross-referenced against article information from OpenAlex, a nonprofit database that contains bibliographic data of published research, including funding information.

| | Federally funded publications (2019-2025) | | | | |
|---|---|---|---|---|---|
| | Gold OA | | Hybrid OA | | Total |
| | Number of publications | Estimated APCs | Number of publications | Estimated APCs | Estimated APCs |
| Springer-Nature | 103,776 | $339,820,165 | 27,913 | $143,624,383 | $483,444,548 |
| Elsevier | 61,965 | $177,075,369 | 37,502 | $144,102,077 | $321,177,447 |
| Wiley | 33,026 | $96,259,171 | 36,399 | $147,343,813 | $243,602,984 |
| Informa* | 5,866 | $14,923,142 | 3,124 | $7,984,159 | $22,907,301 |
| total | 204,633 | $628,077,848 | 104,938 | $443,054,432 | $1,071,132,279 |

*Note: Informa based on incomplete and interpolated data*

97. Between 2019 and 2025, Elsevier's average APC rose from just under $2,000 to around $2,350 for open access journal publications, and from just under $2,700 to around $3,800 for hybrid publications.

98. Between 2019 and 2025, Springer Nature's average APC rose from just over $2,200 to just under $3,000 for open access journal publications, and from $3,000 to just under $4,000 for hybrid publications.

23

99.  Between 2019 and 2025, Wiley's average APC rose from around $2,300 to over $2,500 for open access journal publications, and from around $3,200 to $4,000 for hybrid publications.

100.  From 2019 to 2025, Informa's average APC rose from around just under $2,000 to over $2,000 for open access journal publications and from just over $2,000 to around $2,900 for hybrid publications. [12]

101.  Defendants' alignment on APC price range and trend reflects business practices of charging what the market will bear, rather than tethering their charges to their true costs of public access delivery, despite public access policies of U.S. grantmaking agencies warning that costs must be reasonable and necessary.

102.  The government has done its best to try to mount a response to Defendants' unreasonable price-gouging, but has struggled to coordinate among thousands of grant program officers in dozens of departments in multiple U.S. grantmaking agencies.

103.  In 2022, OSTP Director, Alondra Nelson, made a first attempt to address U.S. grantmaking agencies' expenditure on APCs when she released a memo updating the Holdren Memo, titled "Ensuring Free, Immediate, and Equitable Access to Federally Funded Research," https://bidenwhitehouse.archives.gov/wp-content/uploads/2022/08/08-2022-OSTP-Public-Access-Memo.pdf ("Nelson Memo").

---

[12] Price lists for Informa are estimated from self-reported paid APCs found in the OpenAPC dataset due to Informa not making historical APC pricing data available.

24

104.    The Nelson Memo required federal agencies to update their public access policies to make publications supported by federal funds "publicly accessible without an embargo on their free and public release" abolishing the 12-month embargo period that was impeding public access and that was associated with the maximum hybrid charges. *Id.* at p. 1.

105.    The Nelson Memo invited grantmaking agencies to "allow researchers to include reasonable publication costs and costs associated with submission, curation, management of data, and special handling instructions as allowable expenses in all research budgets." *Id.* at p. 5.

106.    In 2023, however, OSTP wrote in a report to Congress that it had struggled to calculate total expenditures on APCs due to the decentralized nature of the government's expenditure, i.e. no consistent method for paying APCs, and that it had no pricing transparency into academic publishers' true costs for article processing and public access delivery. *See* "Report to the U.S. Congress on Financing Mechanisms for Open Access Publishing of Federally Funded Research," https://web.archive.org/web/20231125212834/https://www.whitehouse.gov/wp-content/uploads/2023/11/Open-Access-Publishing-of-Scientific-Research.pdf.

107.    OSTP wrote that "true APC expenditure records rest with the authors or institutions that pay these fees and the publishers that invoice them." *Id.* at 17.

108.    OSTP commented that the lack of pricing transparency by publishers, including Defendants, made it hard for government agencies to gain visibility into

25

why APCs were so high and whether or not they were reasonable relative to true costs for article processing and public access delivery. *Id.* at 17-18.

109.    OSTP noted in its report that both NIH and NSF were conducting studies to investigate whether the APCs they were paying were reasonable and necessary. *Id.* at 37.

110.    While U.S. grantmaking agencies did their best to try to figure out what Defendants' true costs for article processing and public access delivery were, and what APCs would be reasonable to charge, they amended their policies to provide additional notice to the publishing industry and grantees to be wary of overcharges.

111.    In February 2023, NSF wrote: "NSF will continue its current policy that reasonable data curation and publication costs can be proposed." NSF 2023 Public Access Plan at p. 15, https://nsf-gov-resources.nsf.gov/pubs/2023/nsf23104/nsf23104.pdf.

112.    NSF wrote that it had co-established a public access repository with DOE called NSF-PAR.

113.    In the absence of definitive information about Defendants' true costs for article processing and public access delivery, NSF did not know how to define "reasonable" and undertook instead to "participate in discussions with other federal agencies on the topic of reasonable data curation costs" and "address such concerns to the extent possible." *Id.* at p. 16.

114.    DOE's 2023 Public Access Plan, implemented in June 2023, allowed researchers to include APCs in research budgets, as long as they were reasonable. *See*

26

DOE 2023 Public Access Plan at p. 9,

https://www.energy.gov/sites/default/files/2023-07/DOE Public Access Plan 2023 -

Final.pdf.

115.  DOE noted that it already provided a public access repository, called DOE

Pages, and required PIs to submit all grant products there.

116.  DOE provided that it "will monitor publisher costs/fees and will

determine if additional guidance is needed on 'reasonable' publication costs." *Id.* at p.

6.

117.  In 2024, DOD and NIH also revised their public access policies, noting

their concern about the public access policy changes resulting from the Nelson Memo

causing APCs to rise.

118.  DOD wrote in 2024: "Elimination of the 12-month embargo that was

established by the OSTP memorandum dated February 22, 2013 [the Holdren Memo],

may lead publishers to increase costs to researchers in the form of increased APCs,

with the additional charges billed against funds allocated for research." *See* DOD 2024

Public Access Plan at p. 6, https://discover.dtic.mil/wp-

content/uploads/2024/12/DoD_PublicAccessPlan_Dec_2024.pdf.

119.  NIH, in response to public comments that its 2024 public access plan

would increase APCs, wrote that it "recogniz[ed] that it is unclear how and to what

extent publishing costs will be affected" by the new policy. *See* NIH 2024 Public Access

Policy, https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-047.html.

27

120.   In the absence of information about Defendants' true costs for article processing and public access delivery, NIH and DOD could do little more than provide warnings in their guidance to the industry that they were monitoring the problem. *See id.*; DOD 2024 Public Access Plan at p. 6, https://discover.dtic.mil/wp-content/uploads/2024/12/DoD_PublicAccessPlan_Dec_2024.pdf.

121.   NASA's 2024 Public Access Plan addressed reasonable costs by providing that "review panels will be given guidance on what constitutes 'reasonable' for compliance purposes which may depend on the particular program solicitation." NASA 2024 Public Access Plan at p. 2, https://www.nasa.gov/wp-content/uploads/2025/01/nasa-public-access-plan-2024-dec20final.pdf?emrc=678c6d1900e49.

122.   In October 2024, OMB made updates to address the growing problem of APC expenditure.

123.   OMB amended 2 C.F.R. § 200.461 to clarify that APCs were among allowable charges to deliver public access, but warned that taking advantage of U.S. grantmaking agencies was not acceptable and did not otherwise create any exemption to the reasonableness and necessariness requirement. *Compare* 2 C.F.R. § 200.461 (current version, effective September 30, 2024) ("Page charges, APCS, or similar fees such as open access fees for professional journal publications and other peer-reviewed publications resulting from a Federal award are allowable where: (1) the publications report work supported by the Federal Government; and (2) the charges are levied impartially on all items published by the journal, whether or not under a Federal

award") *with* 2 C.F.R. § 200.461 (effective December 2014 to September 2024) (same requirements, but with no reference to APCs).

124. OMB also made explicit in its 2024 revision to 2 C.F.R. § 200.315 that a grantmaking agency's existing right to license copyrightable work created using a grant included the right to require grantees to deposit grant products in grantmaking agencies' public access repositories.

125. Despite knowing that U.S. grantmaking agencies were concerned about the aggregate costs of their services, Defendants continued their fraud.

126. Elsevier's revenue from U.S. PIs of U.S. grantmaking agencies rose from $19 million in 2019 to above $82 million in 2025; Springer Nature's from $41 million to $105 million; Wiley's from $14 million to above $63 million; and, based on the OpenAPC dataset, Informa's revenues went from at least $2 million to $5 million.

127. Following the Nelson memo, which abolished the 12-month embargo period, Defendants aligned on the intention to abolish green route publication so that they could present all U.S. PIs with APC invoices.

128. In 2024, OSTP updated its 2023 report on U.S. grantmaking agencies' APC expenditure. *See* "Updated Report to the U.S. Congress on Financing Mechanisms for Open Access Publishing of Federally Funded Research" (June 2024) at p. 14-15, https://bidenwhitehouse.archives.gov/wp-content/uploads/2024/06/2024-Report-to-Appropriations-Committee-on-Scholarly-Publishing-and-Public-Access-Implementation.pdf ("There remains limited public information on per-article publication costs, such as those associated with content acquisition, peer review,

29

production, and dissemination, on the revenues collected by the publishing industry, and on how such factors affect APCs. Most publishers consider these data to be proprietary information. Publishers that hold a number of journal titles are also able to employ 'cascading' or 'transfer' systems for submission and review, further complicating the calculation of per-article production costs. This lack of transparency in the relationship between APCs and production costs makes it difficult to project whether and how APCs may increase or decrease over time.").

129.    While U.S. grantmaking agencies worked to investigate Defendants' opaque systems, private foundations funding research were able to make centralized decisions and pivoted hard against paying unreasonable and unnecessary charges.

130.    On January 1, 2025, the Gates Foundation "discontinued support for individual article publishing fees, such as APCs." Gates Foundation, Payment of Publishing Fees, https://openaccess.gatesfoundation.org/payment-of-publishing-fees/.

131.    The Howard Hughes Medical Institute ("HHMI") disallowed HHMI funds from being used to pay for APCs at "hybrid journals." HHMI, "Immediate Access to Research," at p. 2,

30

https://hhmicdn.blob.core.windows.net/policies/Immediate-Access-to-Research.pdf.[13]

132.  Despite knowing private foundations had stopped paying unnecessary and unreasonable APCs, Defendants smugly relied on the decentralized nature of the government bureaucracy to ensure that U.S. grantmaking agencies would be slower to mount a coordinated response in the absence of specific knowledge of Defendants' actual costs of public access delivery.

133.  US grantmaking agencies kept working to try to understand the problem.

134.  On July 30, 2025, NIH issued a Request for Information ("RFI") to try to define the level of reasonable APCs given NIH's ignorance of the true costs for article processing and public access delivery. *See* "Request for Information on Maximizing Research Funds by Limiting Allowable Publishing Costs," https://grants.nih.gov/grants/guide/notice-files/NOT-OD-25-138.html.

135.  In its July 2025 RFI, NIH stated: "Journals with large publishing fees can lead awardees to pay unreasonably high fees from their NIH awards that lessen the funds available for conducting research and which burden American taxpayers." *Id.*

---

[13] HHMI defined hybrid journals as journals that "give authors the option to make their individual articles freely available immediately upon publication" in exchange for APCs, "while the rest of the journal's content remains behind a paywall." HHMI, "Immediate Access to Research" at p. 3. A fully open access journal was "a journal in which all articles are made freely and permanently available online immediately upon publication, without any paywall barrier." *Id.*

31

136.   NIH identified APCs as "unreasonably high fees," noting that the median APC reported worldwide was $950, while the median APC reported in the United States was $2,040. *Id.*

137.   Despite reaching the conclusion that APCs it was paying were indeed unreasonable, NIH struggled to draft guidance that would address the problem.

138.   NIH sought public comment on a variety of options: (1) disallowing all publication costs; (2) setting a limit on allowable costs per publication; (3) setting a limit on allowable costs per publication, but allowing a higher amount when peer reviewers are compensated; (4) setting a limit on the total amount of an award that can be spent on publication costs; and (5) setting a limit on both the per publication cost and the total amount of an award that can be spent on publications. *Id.*

139.   In January 2026, NSF issued a supplement to its Proposal and Award Policies and Procedures Guide ("PAPPG") to address APCs. *See* NSF, PAPPG, Supplement 2, https://www.nsf.gov/policies/document/pappg24-1-supplement-2.

140.   NSF's supplement underscored that U.S. PIs could fulfill its public access requirement by depositing the versions of manuscripts publishers had accepted for publication but not yet formatted or typeset, the author-accepted versions or AAMs, into NSF's own Public Access Repository or "PAR," noting that this "does not require payment of special fees to publishers or other third parties." *Id.*

141.   NSF's 2026 Supplement agreed to continue paying for public access on publisher's websites in the interim, but in June 2023, NSF had committed $299,454 to a study titled, "Investigating reasonable costs to achieve public access to federally

32

funded research and scientific data," which had struggled to estimate the true costs for article processing and public access delivery, despite the authors, scholarly colleagues of Relator, approaching 27 U.S. grantees for assistance reaching cost estimates. *See* https://ui.adsabs.harvard.edu/abs/2023nsf....2330827S/abstract.

142.   On May 21, 2026, the Government Accountability Office ("GAO") published a report titled "Federal Research: Agencies Should Better Manage Anticipated Publishing Cost Increases Amid Shift to Public Access," https://files.gao.gov/reports/GAO-26-107738/index.html?_gl=1*wejxh6*_ga*MTQyMTc4MzY3OC4xNzg0MTI5NTI4*_ga_V3 93SNS3SR*czE3ODQxMjk1MjgkbzEkZzAkdDE3ODQxMjk1MjgkajYwJGwwJGgw ("GAO Report").

143.   GAO noted that OSTP had previously struggled to determine the actual costs of article processing and recommended that its Director "conduct an analysis on the potential effects of its 2022 guidance and ensure this analysis aligns with GAO's key elements of an economic analysis." *Id.*

144.   GAO recommended OSTP update its 2022 guidance based on its findings. *Id.*

145.   GAO noted that consolidation in the academic publishing market was harming smaller academic publishers. *Id.*

146.   GAO noted that commercial publishers, including Defendants, were aligned that the abolition of the embargo period under the Nelson Memo would result

33

in them refusing to offer any subscription-based public access services to U.S. PIs, making APCs a requirement across the board. *Id.*

147. One DOE official told GAO that its U.S. PIs were not encountering any viable market alternative to paying APCs. *Id.*

148. On May 29, 2026, OMB proposed sweeping changes to 2 C.F.R. Part 200 that included a presumptive ban on APCs at 2 C.F.R. § 200.461. *See* https://www.regulations.gov/document/OMB-2026-0034-0001 ("Publication costs (including page charges, article processing charges (APCs), or similar fees such as open access fees for professional journal publications and other peer-reviewed publications) are unallowable under Federal awards," unless "approved in advance by the Federal agency on a case-by-case basis."

149. The proposed rule provides: "A general requirement to make results publicly available must not be construed as authorizing publication costs."

150. While OMB's proposed revisions to 2 C.F.R. Part 200 Subpart E have drawn controversy, its proposal to restrict publication costs at C.F.R. § 200.461 is aligned with the publication cost restrictions of private foundations described *supra* and is also the culmination of a decade of concern by academics and U.S. grantmaking agencies about the aggregate burden of Defendants' APCs and their restrictive copyright agreements.

## C. How Defendants' Scheme Results in Presentment of Claims for Payment and Property

151. Scientific and scholarly researchers communicated their findings to colleagues and to the public by publishing research articles in academic journals.

34

152. Publishers of academic journals traditionally generated their revenue through reader and library purchases and subscriptions.

153. Defendants own between 1,800 and 3,000 selective academic journals each, some more than a century old.

154. By tradition, the copyright of an academic manuscript originally vests with the authors.

155. Defendants have historically stayed in business by presenting authors who wish to publish in their journals with exclusive copyright transfer agreements, relying on reader and library subscription business to generate revenue.

156. Defendants' exclusive copyright transfer agreements historically protected their investment in printing presses, mailing and marketing by preventing other publishers from reprinting articles or journals that became popular.

157. With the advent of electronic publishing, Defendants made their academic journals available online, initially using subscription barriers, also called "paywalls," to ensure that readers and libraries continued to pay for their content.

158. With the advent of electronic publishing, Defendants continued to present exclusive copyright transfer agreements to authors as a condition of publication, even though many readers did not require delivery of print issues of journals and costs of publication had substantially fallen.

159. To pass through a paywall, readers or libraries either took out a subscription to one or multiple of Defendants' journals, obtaining access from

computers on their campus or using login name and password that allowed access, or making a one-off payment online to access a single article or journal issue of interest.

160. With the introduction of public access policies, Defendants continued to present authors with exclusive copyright transfer forms, but began to offer to make certain articles available on their websites without paywalls, instead presenting authors with APC invoices to compensate for the lost revenue.

161. As of the present day, Defendants' editorial process begin when Defendants solicit and receive a submission of a draft manuscript from would-be authors of articles in their journals.

162. Defendants receive the manuscripts because they advertise, market and otherwise promote many of their journals as especially selective or prestigious venues for publication.

163. Defendants also pay academic editors, often minimal honoraria, with an expectation that the academic editors will solicit submissions from authors in the academic editors' professional networks.

164. Defendants sometimes employ nonacademic editorial staff, who either reject manuscripts based on a quick speedread – known as a desk rejection – or work with academic editors to send them out for peer review, purportedly to ensure their quality.

165. Defendants do not however compensate peer reviewers. Instead, Defendants' rely on academics to perform peer review as an academic courtesy to authors or academic editors who are colleagues.

36

166.  After changes by authors following peer review, Defendants accept manuscripts for publication, and transmit them in bulk to contractors, mostly off-shore, who conduct minimal proof-reading and formatting tasks to create a final version of manuscripts that Defendants place online.

167.  Defendants style the final, typeset version of each manuscript as a so-called "version of record."

168.  The author-accepted versions of manuscripts ("AAMs") are however substantively equally useful to the public and to peer researchers, as Defendants' so-called "version of record."

169.  US grantmaking agencies consider deposit of the AAMs in their repositories to be sufficient for public access compliance.

### 1.  Defendants' Presentment of Claims for Payment and Property to U.S. PIs and U.S. Grantees

170.  US PIs of federal grants must acknowledge the specific grants that funded their research in the acknowledgment sections of their articles.

171.  Defendants' online submission platforms solicit references to U.S. federal grants so that Defendants can track which U.S. grantmaking agencies are likely to be the ultimate sources of APC revenue and which U.S. grantmaking agencies have the right to encumber the copyright of authors.

172.  In addition to presenting U.S. PIs with APC invoices as the purported cost of delivering public access to articles in the absence of a source of subscription or paywall revenue, Defendants have begun to solicit and present academic librarians

with "read-and-publish" deals that allow U.S. grantees' U.S. PIs to bypass paywalls and avoid APCs for a bundle of multiple journals in exchange for an annual payment.

173. Defendants' copyright arrangements differ by publication route. For articles in "gold" journals and articles published under "read-and-publish" agreements, U.S. PIs retain the right to deposit and share the version of record of their articles anywhere, including in grantmaking agency repositories.

174. For unpaid "green" articles in subscription and hybrid journals, Defendants typically permit deposit of only the AAM, not the version of record, in a grantmaking agency repository, and only after a 12- or 24-month embargo period.

175. For gold articles, U.S. PIs pay Defendants an APC.

176. For each article that Defendants publish through a "read and publish" agreement, grantees pay Defendants an annual amount that includes payment of the corresponding APC, which is covered through indirect costs.

177. Because Defendants are aware that U.S. grantees pay APCs using funds that originate in whole or in part with the federal grants that the U.S. PIs who are their employees hold and that U.S. grantmaking agencies have the right to require U.S. PIs to deposit their articles in agency repositories under 2 C.F.R. § 200.315, the presentment by Defendants of APC invoices or publishing agreements to U.S. PIs count as presentment of a claim for payment and a property encumbrance on the government's licensing rights.

178. Because Defendants are aware that U.S. grantees with "read-and-publish" deals cover their payments using funds that originate in whole or in part with indirect

cost mark-ups on the federal grants that the U.S. PIs who are their employees hold and that U.S. grantmaking agencies have the right to require U.S. PIs to deposit their articles in agency repositories under 2 C.F.R. § 200.315, the presentment by Defendants of APC invoices or publishing agreements to U.S. PIs count as presentment of a claim for payment and a property encumbrance on the government's licensing rights.

### 2. US Grantees' Presentment of Claims for APC Reimbursement to U.S. Grantmaking Agencies.

179. In addition, U.S. grantees further present APC charges to U.S. grantmaking agencies in one of two ways; as direct or as indirect costs, that they certify are reasonable and necessary.

180. APCs that U.S. grantees have paid Defendants as direct costs correspond to a line-item cost that is reimbursed by a grantmaking agency's payment office to U.S. grantees, pursuant to the U.S. grantmaking agencies' reliance on the grantee certification that all costs charged to their grant were reasonable and necessary.

181. Defendants' presentment of an APC invoice to a PI with knowledge that the PI holds a U.S. grant that the submitted article acknowledges, is a claim for payment, because Defendants have reason to know the PI has a substantial chance of charging their APC to the grant, either through direct or indirect costs, and that the PI has no way to know Defendants' true article processing and public access delivery costs.

182. US PIs have access to academic libraries supported by indirect costs that purchase bulk subscriptions to Defendants' paywalled journal content to allow U.S. PIs employed by U.S. grantees to bypass paywalls.

183. Approximately half of U.S. grantees have used indirect costs to establish library funds to cover APCs for their U.S. PIs.

184. Because Defendants are well aware of the involvement of grantmaking agency indirect costs in supporting academic libraries, their assignment of an APC invoice to a grantee that uses a library fund or read-and-publish agreement to cover it, is a cause of an equivalent claim for payment from U.S. grantmaking agencies through the cost allocation plan procedure, as part of indirect costs.

185. Defendants do not disclose their true article processing and public access delivery costs as part of "read-and-publish" negotiations.

186. Whether government U.S. grantees cover publishers' APCs as direct or indirect costs, the cost principles of 2 C.F.R. Part 200 apply, i.e., U.S. grantees certify annually, at the time they seek reimbursement and at the end of grants, that costs billed to their grants are necessary, documented, consistently charged, and reasonable, as a condition of receiving continued payments under their awarded grants. 2 C.F.R. §§ 200.201(b)(4), 200.403, 415(a).

### D. Defendants' APCs Are Unreasonable and Hence Unallowable Charges to Federal Grants.

#### 1. Defendants' APCs Are Ten Times Their True Processing and Public Access Delivery Costs

187. As described *supra* and below, Defendants charge PIs average APCs of $3,100 and even above $10,000 per article, while independent estimates show that

40

Defendants' average true cost to process articles and deliver public access is $200 to $1,000.

188. In the days of print publishing, Defendants' publishing costs included the requisitioning of a printing press, the purchase of color inks, and the printing and distribution of thousands of copies of physical hard-copy magazines and journals.

189. Defendants do not incur such costs to deliver public access online.

190. Furthermore, today it is U.S. grantmaking agencies, not Defendants, who pay academic authors to perform the intellectual and physical labor that produce an academic article and create a copyrightable work.

191. While some Defendants employ editors and copy editors to receive manuscripts submitted by government-funded authors, these staff costs are modest when compared to Defendants' profits, while the peer reviewers who perform the heavy lifting in the editorial process are entirely uncompensated by Defendants because they participate in peer reviewing as a courtesy to academic colleagues who are seeking publication.

192. Given that authors largely place their manuscripts in Defendants' preferred format prior to submission, allowing for automation in typesetting, Defendants' editors, copy editors or their editorial assistants conduct minimal ministerial article-handling tasks that cost Defendants no more than a couple of hundred dollars on average per article and which contribute negligibly to government open access objectives.

41

193. Factoring in differences among journals' rejection rates, staffing, editorial services, and publishing volume, APCs of between $200 and $1,000 per article are reasonable costs that could sustain an entire open access journal even with a fair profit margin.

194. Relator's colleagues, the academic librarian Alexander Grossman and neurogeneticist Bjorn Brembs, previously calculated the cost of article processing as between $200 and $1,000.

195. Another scholarly colleague of Relator's, a professor of research communication, Cameron Neylon, estimated the cost of article processing as $500.

196. Another calculation by Princeton researchers Tiffany Bogich and Sebastien Ballesteros estimated the cost of article processing as between $69 and $318 per article.

197. One small publisher, Ubiquity Press, noted in 2018 that it was profitable charging an APC of $500 per article, despite lacking Defendants' economies of scale..

198. Relator is aware of academic publishers smaller than Defendants, such as the MIT press, processing articles for actual costs in line with the Grossman and Brembs' estimates, despite lacking Defendants' economies of scale.

199. A former employee of Elsevier, David Parsons, made admissions on social media that the true cost of article processing there was $9-$10, covering all steps from submission to paying editorial staff, academic editor honoraria, administering peer review, and typesetting.

200. Per Parsons, salaries for engineers, distribution staff, and sales and marketing executives were not included.

42

201.   Colleagues of Relator who discussed the Parsons leak assessed the cost range and details to have indicia of reliability because with salaries included it would be likely to align with the Grossman and Brembs estimates.

202.   Dan Rudman, an academic librarian at Utrecht University in the Netherlands, confirmed the accuracy of the Parsons leak with another former Elsevier employee, who explained that the low cost of processing was due to Elsevier achieving a huge economy of scale because it saved articles in bulk on hard drives and sent them to India for processing off-shore by contract employees.

203.   The upper end of the Grossman and Brembs range of $1,000 for article processing reflects the reasonable cost only for the relatively small number of articles published in the most competitive and selective journals, which have a very high ratio of submissions to rejections. Defendants charge APCs above $10,000 to publish in such journals.

204.   Elsevier admitted in comments to NIH recently that its pricing policy considers "acceptance rates, editorial structures and levels of staff involvement, marketing support and more, which are reflected in varying APCs," and says it prices "on the basis of quality" rather than itemized production cost. *See* Compiled Public Comments on the Request for Information on Maximizing Research Funds by Limiting Allowable Publishing Costs, https://osp.od.nih.gov/wp-content/uploads/2025/12/Compiled-Public-Comments-on-the-RFI-on-Maximizing-Research-Funds-by-Limiting-Allowable-Publishing-Costs.pdf, at p. 1201.

205.   Springer Nature wrote in comments to NIH recently that APC pricing "reflects the true cost of publishing and the value we add. APCs vary across journals because more selective journals require greater investment." *Science*, "NIH's proposed caps on open-access publishing fees roil scientific community," https://www.science.org/content/article/nih-s-proposed-caps-open-access-publishing-fees-roil-scientific-community.

206.   Springer Nature explained its highest APCs of $12,690 by citing a high rejection rate at its most prestigious journals, not an itemized cost figure. *See* Compiled Public Comments on the Request for Information on Maximizing Research Funds by Limiting Allowable Publishing Costs, https://osp.od.nih.gov/wp-content/uploads/2025/12/Compiled-Public-Comments-on-the-RFI-on-Maximizing-Research-Funds-by-Limiting-Allowable-Publishing-Costs.pdf, at pp. 1154-1155.

207.   In response to public access policies, Springer Nature and other Defendants have proliferated families of "open access" journals, sometimes called pyramids, which contain cascading systems to transfer rejected submissions to other journals, obscuring true costs of article processing and public access delivery.

208.   Defendants' open access families operate such that when academic editors or peer reviewers for Defendants' most prestigious or selective journals inform nonacademic editorial staff that manuscripts are unworthy or unsuitable for publication in one of Defendants' prestige journals, Defendants can offer to publish them in open access journals Defendants also own on the basis of the same peer

review, so that irrespective of manuscript quality Defendants inevitably will get to hit up a U.S. grantmaking agency for an unreasonable APC.

209.  Due to Defendants' unreasonably marking-up their APCs, the U.S. government has suffered damages of at least the difference between the total amount of unreasonable APCs that grantholding authors actually billed to U.S. grants and the amount of reasonable APCs that grantholding authors could have allowably billed to their grant.

210.  Even if Defendants' reasonable cost of processing and public access delivery per article were as high as $1,000, then Defendants have caused unreasonable charges to U.S. grants of as much as $423 million as the purported cost of publication in "gold" journals (estimated revenue of $628 million in "gold" journals minus $1,000 for each of 204,633 articles with U.S. grant funding).

## 2.   Defendants' Academic Editors With Similar Sense of Prudence as U.S. PIs Find Defendants' APCs Unreasonable.

211.  Defendants' academic editors are similarly situated to U.S. PIs with regard to a shared sense of prudence, but have knowledge of Defendants' actual costs to deliver public access of grant products.

212.  Many of Defendants academic editors are refusing to do business with Defendants because Defendants' egregious price-gouging conduct is causing imprudent academic expenditure.

213.  In the past three years, Defendants Elsevier, Wiley, and Informa have experienced mass resignations of academic editors protesting their price-gouging of

45

academia and of the government, imploring them to keep their prices to reasonable levels.

214.  Defendants are aware, however, that the majority of U.S. PIs who are similarly situated academics to their academic editors but are not privy to Defendants' actual costs lack specific knowledge of their APC mark-ups, as do grantmaking agency program managers who oversee and approve charges to grants that are the ultimate source of Defendants' revenues.

215.  In April 2023, the editorial staff of *Neuroimage*, an Elsevier journal, quit in protest at executives' unreasonable price-gouging. *See* Ryan Quinn, Exodus from An Elsevier Neuroscience Journal, INSIDE HIGHER ED (April 20, 2023) ("Inside Higher Ed article"), https://www.insidehighered.com/news/faculty/research/2023/04/20/opposing-fees-elsevier-editors-leave-start-own-neuroscience.

216.  Elsevier executives did not listen. They ignored the protest and hired new editorial staff who were willing to go along with their unreasonable APCs. *Id.*

217.  Elsevier had increased APCs by about 15 percent, from $3,000 in January 2020 to $3,450 in 2021, on the basis that *NeuroImage* had grown in prestige so the market would bear an increased cost, and not based on any increase ints its true costs of public access services or the quality of its manuscripts.

218.  Cindy Lustig, an academic editor with *NeuroImage*, told a reporter: "'A lot of the research that we're doing is government-funded … So in the U.S., that's from NIH [National Institutes of Health] grants and NSF [National Science Foundation]

grants, and so when people are paying those publication fees, that's money that's going toward this for-profit journal.'" *Id.*

219.    Shella Keilholz, a former *NeuroImage* academic editor with some information about true costs of publishing there, told *The Nation*: "Direct article costs — such as paying for submission and handling software, proofing and typesetting papers, and website hosting — were less than $1,000," while academic editors provide their minimal editing services for "a mere $1,500 to $2,000 a year." Kayla Yup, How Scientific Publishers' Extreme Fees Put Profit Over Progress, THE NATION (May 31, 2023), https://www.thenation.com/article/society/neuroimage-elsevier-editorial-board-journal-profit/.

220.    In August 2023, editors at Wiley's *Journal of Biogeography*, resigned *en masse* to protest unreasonable APCs that Defendant Wiley charges academic authors (including government U.S. grantees) to publish in that journal. Ellie Kincaid, Wiley Journal Editors Resign En Masse, Fired Chief Editor Speaks, RETRACTION WATCH, (Aug. 7, 2023), https://retractionwatch.com/2023/08/07/wiley-journal-editors-resign-en-masse-fired-chief-editor-speaks/.

221.    As with the Elsevier resignations, editors with the Wiley journal had sought to raise issues of unreasonable charges and price-gouging with Wiley before mass quitting. *Id.*

### 3.    Defendants Charge U.S. Grantmaking Agencies More Than They Often Charge Nongovernment Payors, Violating 2 C.F.R. 200.461.

222.    In response to public criticism of their pricing, Defendants have begun to offer APC discounts or waivers to authors who assert inability to pay. *See* Elsevier,

47

"Select the publishing model that is right for you,"
https://www.elsevier.com/researcher/author/open-access/choice; Springer Nature,
"APC waivers and discounts," https://www.springernature.com/gp/open-
research/policies/journal-policies/apc-waiver-countries; Wiley, "Waivers and
discounts," https://authorservices.wiley.com/open-research/open-access/for-
authors/waivers-and-discounts.html; Taylor & Francis, "How to request an article
processing charge discount or waiver,"
https://authorservices.taylorandfrancis.com/choose-open/publishing-open-
access/requesting-an-apc-waiver/.

223. Defendants' authors qualifying as deserving of APC waivers are largely
outside the U.S..

224. While promoting themselves as virtuous for their waiver of APCs for
those who assert inability to pay, Defendants express no shame about systematically
price-gouging U.S. grantmaking agencies for U.S. PIs' APCs.

225. It is not however only those who assert inability to pay who receive
Defendants' discounts, but also private funders that include the Bill and Melinda
Gates Foundation.

226. Relator has identified 452 instances involving U.S.-affiliated authors in
which the Gates Foundation paid Defendants an APC of more than ten percent below
the list price a PI or grantmaking agency would pay, resulting in an average saving of
more than $1,000 per article for the Gates Foundation.

48

227. Relator's dataset shows that Elsevier provided the Gates Foundation a discount of at least ten percent 230 times, Springer Nature 208 times, and Wiley 14 times for articles involving U.S.-affiliated authors. Of these, the discount was of at least fifty percent 30 times for Elsevier, 48 times for Springer Nature, and 8 times for Wiley. In 8 instances, the discount was of more than 80 percent, resulting in an average savings of $3,820 to the Foundation.

228. On information and belief, Informa offered similar scale discounts to the Gates Foundation and other nongovernment payors.

229. Defendants' offer of waivers and discounts creates violations of the requirement at 2 C.F.R. § 200.461 that APCs paid for by grantmaking agencies must be equivalent to all items published by the journal.

230. Furthermore, the scale of the 80 percent discounts offered to the Gates Foundation gives rise to an inference that Defendants could easily charge only 20 percent of their current APCs and still make a profit.

231. Elsevier recently offered Dutch public universities a deal under which it would forgo APC revenue increases if Dutch public universities would agree to commit to subscribe to unrelated data analytic products.

232. If Elsevier can afford to forgo APC revenue then its APCs not only cover its true costs for article processing and public access delivery but also subsidize other parts of Elsevier's business, which is an unreasonable and unnecessary expense for U.S. grantmaking agencies.

### E. Hybrid APCs Are Unnecessary and Hence Unallowable Charges to Federal Grants

233.   Defendants' submission websites link to their pages discussing U.S. grantmaking agencies' public access policies by way of assurances to U.S. PIs that their articles will be freely accessible online and compliant with agency public access mandates.

234.   After U.S. grantees' manuscripts clear the quality control bar of a peer review and are accepted by Defendants for publication, Defendants undertake a bait and switch whereby they present U.S. grantees with their choice to either pay an APC to have their article published on Defendants' websites without a paywall in place, or to pay nothing to have their article available only behind a paywall on Defendants' websites.

235.   As evidence that Defendants' fraudulent marketing scheme is working, their hybrid journals charge higher APCs than equivalent open access journals for the same services.

236.   Defendants, veteran businesses in the online publishing industry, know that articles in government repositories are accessible online and readily appearing in search engines, AI systems, and funding agency indexing systems such as the NIH PubMed system, where the public can access them equally or more easily as they can on Defendants' websites.

237.   At the time the Holdren Memo was effective from 2013 to 2022, Defendants' marketing obscured from U.S. PIs that while public access policies allow for an embargo as a ceiling or grace period by which U.S. PIs must deliver public

50

access compliance, it was Defendant's choice never to offer or allow for deposit of green route articles in grantmaking agency repositories any sooner than the ceiling.

238. Defendants' presentment of U.S. grantees with the option to either pay an APC or to publish via the green option, only after their articles have cleared peer review, tricks many U.S. PIs into paying the APC based on U.S. grantees misunderstanding that this is necessary to deliver open access when, in reality, the U.S. grantees could opt for green and still be in public access compliance.

239. While, in 2013, Defendants promoted the idea of hybrid journals as necessary because it was the only way to transition their business from subscription-based model to gold open access, almost none of their hybrid journals transitioned to full public access until compelled by the Nelson memorandum, but rather became cash cows that Defendants had no intention of transitioning to less profitable open access journals.

240. Furthermore, at Defendants' hybrid journals, there is no need whatsoever for Defendants to charge APCs to cover open access, because U.S. grantees whose articles are behind a subscription barrier on Defendants' websites can still deposit their work online in a grantmaking agency repository where search engines such as Google can access it, while Defendants' operations are fully supported by readers who pay to read the paywalled versions of articles on Defendants' websites.

241. Thus, by Relator's expert assessment, Defendants have caused unreasonable charges to U.S. grants of as much as $443 million as the purported cost of publication in "hybrid" journals.

51

242.  Defendants' unnecessary hybrid APCs also previously caused grantees to unknowingly violate 2 C.F.R. §200.403(d), which prohibits like charges to grants within both indirect and direct costs.

243.  Relator's monitoring of Defendants business practices has found that Defendants provide the same services for article processing and public access delivery services for publication in any of their gold, hybrid or subscription journals, with the only difference being how Defendants get paid.

244.  Elsevier's former Director of Universal Access previously admitted in testimony to the UK parliament that article processing, including the cost thereof, doesn't change based on whether payment comes from the author's side or the reader's side. *See* UK Parliament House of Commons, *Oral Evidence Taken Before the Business, Innovation, and Skills Committee* (Apr. 16, 2013), https://publications.parliament.uk/pa/cm201213/cmselect/cmbis/uc1086-i/uc108601.htm.

245.  Prior to Defendants' invention of read-and-publish agreements, Defendants presented grantee libraries with invoices for subscriptions to hybrid journals while also presenting PIs with APCs to publish in those same journals.

246.  The bulk of a hybrid journal APCs do not, however, cover the public access delivery portion of article processing, but rather editorial staff salary, peer review administration, infrastructure, and other services, which does not differ between green and gold publication.

247.  On information and belief, Defendants invented read-and-publish agreements in the knowledge that hybrid journals were gaining a reputation for double dipping federal grants and because of mounting concern for the rising costs of APCs.

248.  The pricing and negotiation of a read-and-publish agreement depends on the grantee's subscription and publication needs, and therefore requires Defendants to track and define the costs and revenue from gold, hybrid and subscription publication on a per article basis.

249.  In the alternative, Defendants fail to track the ratio of true cost of article processing and public access delivery to revenues, for individual articles and journals, rendering it impossible that grantee payments or copyright transfers to Defendants are adequately "documented" charges to federal grants under 2 C.F.R. § 200.403(g), rendering them unallowable.

### F.  Defendants's Strategies To Hide True Article Processing and Public Access Delivery Costs And Otherwise Induce Continued Payment

250.  Defendants know when government agencies are the source of funds for APCs because grantmaking agency regulations require academic researchers to report agency support in the acknowledgment sections of their articles, and Defendants' editorial processes collect this information as part of the submission process.

251.  As described *infra*, Defendants aggregate this funding "metadata" to inform their strategy in targeting U.S. government U.S. grantees to mislead them into paying Defendants' unreasonable APCs.

252. In 1999, academic publishers including Elsevier, Nature (now part of Springer Nature) and Wiley cooperated to incorporate an entity in New York called "Publishers International Linking Association" or PILA, which today does business under the name "Crossref."

253. Taylor & Francis, the academic publishing arm of defendant Informa, joined Crossref in 2000.

254. As originally conceived, Crossref had the purpose of creating standard "digital object identifiers" or "DOIs", to identify scholarly articles on the internet.

255. In 2012, using a donation from Defendant Elsevier, the Crossref board voted to create a database called "Fundref," later renamed "Funder Registry" and in recent months rebranded again to "Open Funder Registry." *See* Publishers International Linking Association Motions Approved by the Board – 2012, available online at http://www.crossref.org/pdfs/motions-2012.pdf at 2.

256. Open Funder Registry is a database of funder information, such as different U.S. Government agencies, that can be used to more reliably connect published articles with the organization that funded the research.

257. Defendants collect funder information from grantees using the Open Funder Registry during the submission process to clearly identify which U.S. grantmaking agencies are named in the acknowledgment sections of each article and what copyright license Defendants have permitted for public access compliance purposes.

54

258. Open Funder Registry acknowledges that by using its data: "Publishers can track who is funding their authors." *See* Open Funder Registry, https://www.crossref.org/services/funder-registry/.

259. One of Defendants' main purpose in creating Open Funder Registry was to enable Defendants to align APCs and copyright terms and prevent U.S. grantmaking agencies from easily finding alternative options.

260. Defendants can use funder information linked to published articles to set or adjust APCs for their journals to what U.S. grantmaking agencies will pay, rather than in relation to the true costs of public access delivery.

261. Indeed, Defendants do not share information on their actual article processing costs.

262. In 2018, European funding agencies began to promote a strategy called "Rights Retention," which would require authors with European funding to append a statement to manuscripts before they submitted them to academic publishers, reserving the authors' rights to deposit the final version of their article in a funding agency repository to ensure public access, even if they did not pay an APC, thereby also asserting European government rights in copyright that taxpayers had paid to create.

263. "Rights Retention" was the voluntary equivalent to the longstanding right of the U.S. to license PI copyright under 2 C.F.R. § 200.315(b).

264. Defendants were alarmed by the Rights Retention Strategy.

265.  In 2020, employees of Wiley, Informa and Springer-Nature, began to conspire about how to make sure grantees with public access obligations kept paying APCs.

266.  Defendants attempted to harness an international organization called the Open Access Scholarly Publishing Association ("OASPA") to achieve this goal.

267.  In 2020, Caroline Sutton, the Vice-President for Open Research at Taylor & Francis (the academic publishing arm of defendant Informa) sent an email to the OASPA board about having discussions with Liz Ferguson, the Vice-President for Open Research at Wiley, Carrie Webster, Vice-President for Open Access at Springer Nature, and executives at other publishers.

268.  Sutton discussed Defendants' realization that if funding agencies encouraged their U.S. grantees to participate in green publishing, i.e., self-archiving elsewhere than on publishers' proprietary platforms, U.S. grantees would realize that APCs were unnecessary for procuring open access and would stop paying them, so as to quite properly and prudently reserve their government funding for research activities.

269.  Relator was included in the email due to his membership on the OASPA board.

270.  Although OASPA purported to be an organization promoting transparency, Relator had been asked to sign a Non-Disclosure Agreement as part of his involvement with OASPA.

56

271.   Relator had signed the agreement on the understanding that he was according colleagues academic courtesy to deliberate and reach consensus prior to publishing think pieces on the OASPA blog, but did not expect to become privy to outright unlawful conduct by Defendants.

272.   Relator had studied scholarly publishing for many years without being under NDAs and encountering conspiratorial discussions such as he became privy to after signing the OASPA NDA.

273.   Sutton acknowledged in the email she believed would remain confidential within OASPA that U.S. grantees are more likely to select gold over green publication, even though paying for gold is unnecessary.

274.   "Green … is an easy route to compliance that means a researcher does not need to tap into their grant funding," Sutton wrote. Rather than expressing concern for the public fisc, Sutton instead proposed to her colleagues, employees of purported competitors, that they should all coordinate to obfuscate the viability of the green open access option and to persuade government agencies and their U.S. grantees not to favor it or insist on the retention of copyright that would enable it.

275.   Sutton also wrote that if not for COVID, she would not be putting her thoughts in writing but would have preferred to meet to talk with the other employees for chats in person.

276.   Authorized representatives of Defendants Wiley, Informa, Springer-Nature, and other publishers, subsequently coordinated to sign a statement drafted by Sutton misleadingly claiming that funding agencies should not mandate the Rights

Retention Strategy because it would undermine the publishing business. OASPA, "The Rise Of Immediate Green OA Undermines Progress" (Dec. 4, 2020), https://oaspa.org/open-post-the-rise-of-immediate-green-oa-undermines-progress/.

277. Defendants wrote: "Why spend your research grant money on the cow if you can get the milk for free?" *Id.*

278. In this analogy, the "milk" is the commodity of open access, while the "cow" is the academic publishing industry, which Defendants intend the U.S. grantmaking agencies to spend taxpayers' money on.

279. Defendants' public statement contained no numerical information whatsoever about the true costs of public access services, nor did it acknowledge that this is less than one tenth of the APCs they charge.

280. After Defendants Springer-Nature, Informa and Wiley used the OASPA website to argue that government U.S. grantees should pay unnecessary APCs, Defendant Elsevier joined OASPA.

281. At the same time, Nick Fowler, CEO of Elsevier, ceded his role at the head of the leading academic publishing association, the Scientific, Technical and Medical Publishers Association, to Sutton.

282. On information and belief, Fowler and Sutton, directly or through other employees of Elsevier and Wiley, have held confidential sidebar discussions about their desire to maintain APC revenue through secret cross-industry agreements, over coffee or otherwise.

283. Unless APCs are paid, Defendants' copyright agreements uniformly do not, however, allow U.S. PIs to share the final, typeset, "versions of records," anywhere other than Defendants' websites, thereby blocking smaller publishers and grantmaking agency repositories from making an effective market entry as affordable public access alternatives for finding the "versions of record."

284. When Defendants accept an article for publication via the green route, i.e., without charging an APC, they require authors to sign uniform agreements that contract away all rights, and then license U.S. grantees the right to place their articles online elsewhere than Defendants' websites in a typesetting and format containing self-disparaging but meaningless language that this article is not the "version of record" and containing a hyperlink to Defendants' websites, where the same article is available in Defendants' proprietary typesetting and format but behind a paywall.

285. Relator possesses copies of Defendants' copyright agreements that are aligned in containing the idiosyncratic and confusing copyright terms and procedures described *supra*.

286. The "version of record" phrase employed by Defendants in their copyright agreements is an artificial and misleadingly named standard as Defendants know or should know that no technical or other obstacle whatsoever prevents academic articles from being archived online with integrity in locations other than Defendants' websites and in formats other than Defendants' typesetting, thereby delivering equal public access as Defendants' so-called "version of record."

287.   In addition to coordinating on copyright terms and the artificial "version of record" standard, Defendants executed a *per se* unlawful contract that they call the CHORUS Membership Agreement, where CHORUS stands for Clearing House for Open Research of the United States.

288.   CHORUS was established by a former or current employee of Defendant Springer Nature by the name of Howard Ratner.

289.   Under the CHORUS Membership Agreement, Defendants pool the entirety of their federally funded content in a jointly held "dark archive."

290.   CHORUS functions as a mechanism to prevent any one Defendant from cheating others in their cartel by innovating its copyright agreement to include different copyright terms than the collusively aligned terms that benefit Defendants by compromising market functionality.

291.   Defendants' alignment on copyright terms, APCs, the Funder Registry, the CHORUS arrangements, and the Sutton-led conversations in 2020, demonstrate Defendants' ability to hold federally funded research hostage so as to keep government agencies and their U.S. grantees paying unreasonable and unnecessary APCs despite deep and widening concern by U.S. grantmaking agencies, Congress, and academics informed that the true costs of public access compliance are less than a tenth of what Defendants charge.

## CAUSES OF ACTION

### COUNT ONE
### Violation Of 31 U.S.C. § 3729(a)(1)(A)

**Causing Unreasonable Article Processing Charges, Rendering U.S. Grantees'
Certifications of Cost Reasonableness to Grantmaking Agencies False**

292. Relator incorporates all foregoing paragraphs as if fully set forth in Count One.

293. Relator Alperin, on behalf of the United States, seeks relief against Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

294. From 2014 to the present, Defendants knowingly caused to be presented false or fraudulent claims for payments in grant applications or grant progress reports submitted to United States grant agencies, including but not limited to grant numbers: NSF 1849588 or SRC SB-2837-B, NSF 171877, NSF 2004875, NIH DP1OD022296 or P41EB015903, NIH R13AR073334, and NIH R34-AR-076077.

295. Specifically, Defendants knowingly caused to be presented false certifications of compliance with the cost principles contained within 2 C.F.R. Part 200 and 45 C.F.R. Part 75.

296. These certifications were false because Defendants knew that article processing charges were not reasonable as defined within 2 C.F.R Part 200 and 45 C.F.R Part 75 because they were not costs that a prudent person would incur and were grossly in excess of Defendants true cost for processing articles and delivering public access.

297. Defendants knew that these costs were unreasonable and knew that grantees would seek reimbursement for these costs from the United States.

298.   The false certifications of cost reasonableness caused in federal grants by the Defendants were material to the grant agencies' decision to make payment to cover APCs under the grants, whether as direct or indirect costs.

299.   Defendants' failure to document their true article processing and public delivery costs, if applicable, further supports the unreasonableness of their causing claims for payment of their APCs.

300.   By reason of the false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus civil penalties for each violation.

## COUNT TWO
### Violation Of 31 U.S.C. § 3729(a)(1)(A)

**Causing Unnecessary Charges for APCs for Hybrid journals And False Certification by U.S. Grantees to U.S. Grantmaking Agencies That All Charges are Necessary**

301.   Relator incorporates paragraphs 1-295 as if fully set forth in Count Two.

302.   From 2014 to the present, Defendants knowingly caused to be presented false or fraudulent claims for payments in grant applications or grant progress reports submitted to United States grant agencies, including but not limited to grant numbers: NSF 1849588 or SRC SB-2837-B, NSF 171877, NSF 2004875, NIH DP1OD022296 or P41EB015903, NIH R13AR073334, and NIH R34-AR-076077.

303.   Specifically, Defendants knowingly caused to be presented false certifications of compliance with the cost principles contained within 2 C.F.R. Part 200 and 45 C.F.R. Part 75.

304. These certifications were false because Defendants knew that article processing charges associated with "hybrid journals" were not necessary as defined within 2 C.F.R Part 200 and 45 C.F.R Part 75 because publication via hybrid journals' green route was free and would still permit public access compliance.

305. Defendants knew that these costs were unnecessary and knew that grantees would seek reimbursement for these costs from the United States.

306. The false certifications of cost necessity caused by the Defendants were material to the grantmaking agencies' decision to make payment or reimbursement for APCs, whether by direct or indirect costs.

307. Defendants' failure to document their true article processing and public delivery costs, if applicable, further supports the lack of necessity of the claims for payment of hybrid APCs.

308. By reason of the false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus civil penalties for each violation.

## COUNT THREE
### Violation Of 31 U.S.C. § 3729(a)(1)(G)

#### Knowingly Concealing Inflated Article Processing Charges

309. Relator incorporates paragraphs 1-295 as if fully set forth in Count Three.

310. By virtue of the acts described above, including but not limited to inducing or otherwise causing government grantees to certify that APCs billed to government grants complied with terms and conditions of those grants, including the requirement that billed costs be reasonable and necessary, and by means of fraudulent

63

marketing, collusion, and hiding of their true article processing and public access delivery costs, Defendants knowingly concealed an obligation on grantees to make repayment of their unallowable costs to the grantmaking agencies, in violation of 31 U.S.C. § 3729(a)(1)(G).

311.  Defendants not only caused false claims for payment, but also caused false certifications by grantees at close-out of their awards that all costs on their grants had been allowable.

312.  Defendants' failure to document their true article processing and public delivery costs, if applicable, has acted to conceal unallowable charges owed to grantmaking agencies.

313.  By reason of the false or fraudulent reverse claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus civil penalties for each violation.

**COUNT FOUR**
**Violation Of 31 U.S.C. § 3729(a)(1)(C)**

**Conspiracy to Present U.S. Grantees with Fixed Article Processing Charges and Copyright Terms In Violation Of the False Claims Act**

314.  Relator incorporates paragraphs 1-295 as if fully set forth in Count Four.

315.  Relator Juan Alperin, on behalf of the United States, seeks relief against Defendants under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

316.  The Defendants conspired to violate 31 U.S.C. § 3729(a)(1)(A) and § 3729(a)(1)(G) by establishing a scheme by which the Defendants manipulated the market for scientific publishing, thereby causing payment for unnecessary and

64

unreasonable article processing charges by U.S. grantees and PIs that they knew would be passed on to the United States.

317. Through Defendants' acts described above and in furtherance of their conspiracy, Defendants unlawfully colluded to pool and align their copyright terms so as to be able to charge government U.S. PIs and U.S. grantees higher prices for procuring public access, in violation of 31 U.S.C. § 3729(a)(1)(A).

318. Without this illegal agreement between the Defendants, none of them would have been able to individually charge such unreasonable and unnecessary article processing charges to U.S. grantees and PIs and successfully cause the United States to pay these as direct or indirect costs on grants.

319. In virtue of Defendants' acts described above, Defendants knowingly caused government U.S. grantees to receive reimbursement for unnecessary and unreasonable charges for payment to U.S. grantmaking agencies, in violation of 31 U.S.C. § 3729(a)(1)(A), (G), and (D).

320. Defendants' acts were material to the United States' and its U.S. grantees payment decisions because the grantmaking agencies had made clear in guidance they did not want to spend unnecessarily and unreasonably on APCs for articles that could be made publicly available at a fraction of the cost in the absence of Defendants' coordinated price-gouging conduct.

321. In virtue of the false claims presented or caused to be presented by Defendants, the United States suffered damages and therefore is entitled to treble

damages under the False Claims Act, to be determined at trial, plus civil penalties for each violation.

**COUNT FIVE**
**Violations Of 31 U.S.C. § 3729(a)(1)(D)**
**Fixing Copyright Terms to Encumber Government Licensing Options**
**Under 2 C.F.R. §200.315(b).**

322. Relator incorporates paragraphs 1-295 as if fully set forth in Count Five.

323. By virtue of the acts described above, including but not limited to colluding to impose restrictive copyright terms on grantees who declined to pay unreasonable or unnecessary APCs and were required to select green self-archiving of their articles while facing coordinated copyright encumbrances imposed by Defendants across the industry, Defendants knowingly delivered less public access to U.S. taxpayers than the United States grantmaking agencies and its authorized grantees were entitled to under 2 C.F.R. § 200.315(b), in violation of 31 U.S.C. § 3729(a)(1)(D).

324. Defendants' failure to deliver ready public access was material to the United States because the White House and grantmaking agencies following its lead had the objective of delivering full open access in a healthy market without encumbrances from collusive copyrighting arrangements.

325. In virtue of Defendants' unlawful withholding of government-created information from the U.S. taxpayer, the United States is entitled to treble damages under the False Claims Act, to be determined at trial, plus civil penalties for each violation.

**PRAYER FOR RELIEF**

WHEREFORE, Relators, on behalf of the United States, pray that judgment be entered in their favor and against Defendants as follows:

A.      That Defendants pay the United States triple the amount of its damages to be determined, including the damages flowing from their ongoing conspiracy, plus the appropriate civil penalties for each false claim, statement, or record they made or caused;

B.      That Relator be awarded all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1) and 31 U.S.C. § 3730(d)(2);

C.      That in the event that the United States proceeds with this action, Relators for bringing this action, be awarded an amount of at least fifteen percent but not more than twenty-five percent of the proceeds of any award or the settlement of any claims;

D.      That in the event that the United States does not proceed with this action, Relators be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than twenty-five percent and not more than thirty percent of the proceeds of any award or settlement;

E.      That within the ranges for Relator compensation set forth by statute, Relators be awarded the maximum amount pursuant to 31 U.S.C. § 3730(d);

F.      That in the event that discovery implicates Defendants in causing adverse consequences for Relator's employment, that Relator receive compensation from Defendants for two times back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation, to be proven at trial, including litigation costs and reasonable attorneys' fees;

G.      That in the event that Defendants' conduct, including frivolous or unreasonable litigation conduct, causes special damages for Relator, that Relator receive compensation for any special damages sustained as a result of their retaliation to be proven at trial, including punitive damages, litigation costs and reasonable attorneys' fees;

H.      That Relator be entitled to an award of a Relator share of between 15% and 30% of the government's recovery pursuant to this action.

I.      That if the United States pursues or obtains an alternate remedy as a consequence of this action, Relator be entitled to an award of a Relator share that is between 15% and 30% of the value of the alternate remedy the government obtains.

J.      That Relator be awarded pre-judgment and post-judgment interest; and,

K.      That the Court award such other and further relief as is just, equitable, and proper, including, if so moved by Relator or the United States, a consent decree to prevent collusive efforts and price-gouging in the academic publishing industry.


**Relators request a jury trial on all issues so triable.**


By:    s/ Eugenie Reich
       Counsel for Relators

Eugenie Reich, MA Bar 703853
**EUGENIE REICH LAW, LLC**
Arch Street, #819 (Eighth Floor)
Boston, MA 02110
(617) 821-1538
eugenie@eugeniereichlaw.com

68

John R. Thomas, Jr. PHV Pending, VA Bar 75510
**HAFEMANN, MAGEE & THOMAS, LLC**
P.O. Box 8877
Roanoke, Virginia 24014
(540) 759-1660
jt@fed-lit.com